We'll hear the next case on the calendar, Lewis v. Swicki. Rosendo Garza Good morning, Your Honors, and may it please the Court. My name is Rosendo Garza, and I, with my colleague John Serrata, represent Ms. Christopher Lewis, a plaintiff appellant in this matter. This is an appeal from the Grant Summary Judgment. The district court's orders should be vacated and remanded for two reasons. First, the district court failed to view the evidence in the light most favorable to a nonmoving party when analyzing the evidence under the second farmer prong, which requires an inmate to show that prison officials possess sufficient culpable intent. The record shows that in July 2010, Lewis had a serious disagreement with the leader of a violent group. Breyer, before you get to that, could you get to the first prong? Absolutely, Your Honor. In the first prong, the district court misapplied the first prong under farmer, which requires an inmate to show that he was incarcerated under conditions posing a substantial risk of serious harm. As I was stating earlier, the record shows that in July 2010, Lewis had a serious disagreement with an inmate, Mulligan, the then leader of a violent prison gang called Piru Bloods, and one of its members and the would-be assailant, Inmate Trabacoulis. Subsequently, Defendant Zwicky documented this disagreement in an incident report. Afterwards, but still in July, Defendant Zwicky intercepted a communication from Mulligan stating that Lewis, quote, was done, unquote, for disagreeing with and violating the prison gang rules. The record also showed that on two occasions, the defendants warned Lewis of a threat to his safety. The first warning came in October or September when Zwicky told Lewis that he had information that somebody was going to attack Lewis. The second warning came in September. At this meeting, Zwicky and Butkowitz told Lewis that they were aware of the incident between Lewis, Mulligan, and Trabacoulis, that Lewis's, quote, safety can be at jeopardy, unquote, and that a member from the Piru Bloods was going to carry on an attack, would carry out an attack against him. On November 25, 2010, Trabacoulis attacked Lewis in the recreation yard. The district court found this evidence to not meet the first prong under Farmer because it applied the wrong standard. Specifically, the court applied- All right. Could I ask you a question about the attack happened several months after the meeting, and that was several months after the first conversation, is that right? That's correct, Your Honor. And what amount of time has to pass before a threat no longer is imminent? There's nothing that creates a bright-line rule of how much time is sufficient to pass. We argue that under the circumstance in this case, not enough time had passed. The threat continued to be imminent because under the realities of the SRGTM program, an attack is harder to carry out. We understand that the strictures of the program created difficulty for Trabacoulis to get to Lewis. Therefore, the attack was imminent. All that was required was an opportunity for Trabacoulis to be in the near proximity to Lewis, which was presented on November 25, 2010. So there's no bright-line rule, which is what the state is substantially arguing, to create. How would you respond to the view that looking objectively at the circumstances of incarceration, with all of the procedures in place, that there was not a substantial risk in this case? What the record shows is that there was substantial risk to serious harm in this case, irrespective of the procedures. Specifically, he was supposed to be, I mean, I'll let you finish, of course. He was supposed to be strip-searched before leaving a cell for recreation, handcuffed, right, with hands behind his or her back, his back, throughout the recreation. There were protocols apparently in place so that objectively there was a low risk, this is the argument, or not a substantial risk. Well, in this case, Your Honor, as the record shows, the substantial risk is there was a disagreement between Lewis and the leader of Violent Prison Gang. The Violent Prison Gang leader issued an order stating that Lewis was done for disagreeing with and violating those prison gang rules. The substantial risk harms then, it allows reasonable inference that when the member of the Bureau of Bloods would be in proximity to travel coolers, that risk becomes substantial. And in your question, and Your Honor— Was there any evidence introduced at all that the procedures were not working, in the past working, either because they were, you know, not adequate or because they weren't rigorously implemented? No, Your Honor. There's no evidence in the record that that is the case. And Your Honor's question also implicates the second inquiry of the second farmer problem with respect to the reasonable measures taken by the prison officials. In that respect, there is record in the evidence. I misspoke. There's evidence in the record that there was a reasonable measure to transfer Lewis out of that particular prison could have been possible. And I direct this Court's attention to Joint Appendix, page 43, at line 21, in which the deposing counsel asked Mr. Lewis whether he had been — when he was transferred to Northern, and that was on January 12, 2009. Then the deposing attorney asked the reason why he was transferred to Northern, and Mr. Lewis testified that he was transferred because he violated a particular regulation. But then, as stated in line 5 at page — Joint Appendix 44, the deposing attorney asked, were you sent to Northern because you were identified as being in a security risk group? And Mr. Lewis answered that he had been identified as a security risk group before he received the ticket. The reasonable inference, then, is that when somebody is a member of the security risk group, prior to being — can be transferred into Northern, the reasonable inference is that he can be transferred out of Northern under the circumstances of this case, which — But the whole point for all the restrictions in this group is because there is a risk of assault. And so why transfer someone when they're in a facility that's sort of designed around addressing the risk of assault? The prophylactic measures that are designed within the SRGTM program is for every inmate, because precisely as Your Honor has identified, they are — there's some risks, there's some antisocial, violent behavior within the inmates that are placed in this. But in this case, Mr. Lewis wasn't like every single inmate in that program because he had been identified and been targeted for attack by the leader of a violent prison gang. So under those particular instances, the reasonable measures that were taken or the risk is not taken is what — is a reason to conclude there was a difference on behalf of the defendants. If I may continue with the first prong, Your Honor. The district court applied the wrong standard by searching for the obvious nature of the substantial risk of serious harm. And in doing so, it weighed and assessed the credibility of Mr. Lewis's deposition testimony, characterizing it as uncertain and ambiguous. There was nothing uncertain or ambiguous. Mr. Lewis testified that he — the defendants were aware of the July disagreement, that defendants warned Lewis that his safety could be in jeopardy and that a member of the Piru Bloods would carry out the attack. Now, to be sure, Lewis's testimony could have been clearer, but that's for the matter of the jury. And it's important to note that in opposing summary judgment, Lewis did not just rely on his deposition testimony. There was evidence before the court, the district court, that in the November incident report detailing the assault on Lewis was presented. In that report, Zwicky wrote that the order by Inmate Mulligan to assault Inmate Lewis stemmed from a disagreement between Inmates Lewis, Mulligan, and Trevor Kulis, as documented in July 2010 incident report. In addition, the court had Zwicky's affidavit, which averred that he had intercepted Mulligan's communication statement and Lewis was done. So accepting Lewis's testimony as true, coupled with the documentary evidence, allows for the reasonable inference that Mr. Lewis was an active threat on Lewis's safety, which shows that he was incarcerated under conditions posing a substantial serious harm, namely that active threat issued by the leader of a violent prison gang. The obvious nature is not required under Farmer. And if I may continue to the second prong, Your Honor. Under the second prong, as I stated, the inmate must show that the prison officials possess sufficient culpable intent. And this prong requires a two-tier inquiry. Prison officials act with sufficient culpable intent if, one, they have a knowledge that an inmate faces a substantial risk of serious harm, and, two, they disregard that risk by failing to take reasonable measures to abate the harm. Although not explicit, the district court appears to have concluded that the defendants had no knowledge that Lewis faced a substantial risk of serious harm. But the record belies that conclusion. As I stated earlier, Mr. Lewis had a disagreement with the leader of a violent prison gang. The prison gang leader issued an assault on Mr. Lewis, and that communication was intercepted by Sawicki. And accepting Mr. Lewis's deposition testimony as true, he was warned by the prison officials. Therefore, he makes out the first showing under the first inquiry of the second Farmer prong that the defendants knew that there was a substantial risk of serious harm. And with respects to the second inquiry of the second Farmer prong regarding the reasonable measures to abate the harm, the district court held that the procedures in place at Northern pertaining to the SRGTM program inmates virtually preclude a finding of deliberate indifference. In effect, the district court has created a per se rule that in Connecticut, when an inmate is placed under the SRGTM procedures, it can virtually never make a case that the prison officials fail to take reasonable measures. But the district court in this case failed to overlook, rather, the record before it. As stated earlier, there was a disagreement between Lewis and a leader of a violent prison gang. That leader issued an order that he was done, meaning Lewis, for disagreeing with and violating prison gang rules. The defendants warned Lewis of this threat, and the defendants told Lewis that it was a member of the Pure Bloods who carried out the attack. And the defendants knew that Trapakoulis was a member of that gang. Under those circumstances, the reasonable measures would have been to transfer Lewis, as stated earlier, which is a reasonable inference that can be drawn from the evidence before the district court. Another reasonable measure to abate the harm would have been to create a segregation order, simply not allowing Pure Bloods in the same recreation yard as Mr. Lewis. Of course, your adversaries would say that they were following the strict protocols that were in place. Yes, Your Honor, but the strict protocols do not make any mention of what happens in the instances under the facts of this case. Namely, when there is evidence that there's a threat against a particular inmate, and that threat is issued by a particular gang leader, and then the defendants know who's going to carry out the attack, in this case, the organization. And the fact that they didn't identify the inmate, in this case, Trapakoulis, is not dispositive, as the Supreme Court informer stated. I'm sorry, that, pardon me, Your Honor. Well, it's not just that they haven't identified the individual. It's that some time has passed. Everybody is in handcuffs behind their back at all times outside their cell. They're under constant supervision. Even if there was this vague assault threat out there, it's unclear to me what more could have been done, or should have been done, or certainly what was unreasonable to, or deliberate indifference not to do, in this situation. As mentioned earlier, Your Honor, the defendants could have transferred Mr. Lewis to a different facility, or they could have put a segregation order. But what about this set of circumstances is deliberately indifferent to a risk, given all the precautions that you just mentioned? Well, under the test under Farmer, they knew that there was a substantial risk of serious harm, and they didn't take any additional reasonable measures to abate that harm. In effect, the defendants allowed nature to run its course, which resulted in allowing Trapakoulis to be placed in a prison yard on November 25, 2010, and thereby attacking Mr. Lewis. So that's something that is an anathema to Farmer. The reasonable best of defendants' actions or inactions are more suitable for resolution for jury for trial. I see that my time is up. If there's any further questions, Your Honor, I reserve two minutes for rebuttal. Thank you. Judge Katzmann, Judge Newman, Judge Park, good morning. James Cayley, Assistant Attorney General, on behalf of Lieutenant Zwicky and Captain Butkowitz. Just before I begin, just to note a couple of things. One is that this particular unit had all Piru bloods in it. So to the extent that there's relief or there's a suggestion that they should have segregated Mr. Lewis from Pirus, that wouldn't work here, because they were all Pirus that were in that unit. Well, that doesn't quite answer his suggestion that they shouldn't be put in the same recreation yard at the same time, even though they're in the same prison. I appreciate he said transfer, but let's not spend a lot of time with transfer. They were put in the same recreation yard at the same time, were they not? They were, Your Honor, handcuffed behind their backs. And also, just to call attention to this one piece before I move on, the proponent of the threat, he's done, inmate Mulligan, had been transferred at the time of the attack. He wasn't even there. He was gone. So — Well, I'm going to follow that. This man was attacked, yes? Yes, Your Honor. He was attacked by inmate Traboculos, but the — Is he a member of the gang? He was, Your Honor. And did the leader of the gang say that this victim is done? He said in July he's done. He's done. He's done, Your Honor. You don't think that carries some threat? Well, I think that there was some investigation post-assault where they determined that it was a standing order left from inmate Mulligan. But — A standing order that he's done. Standing order. That's what they — that's what the determination was, was it was a standing order. And it had to be because the proponent of the threat, the person making the threat, wasn't even there. He was long gone. But he wasn't making it. But the order is standing, by your own admission. That's right, Your Honor. But they didn't know it was an order until after they did the investigation, which was after the assault. But they had heard about the threat. They — well, there was two sources. How many do you need? Well, Your Honor, you have — we have source one, which is a statement that is in an recent report that Lieutenant Zwicky records that inmate Mulligan had said this particular inmate, Lewis, was done in July. He's done in July. Then you have — the second source is the victim here, inmate Lewis, who says very — in very uncertain and ambiguous terms, I was told there's an issue brewing. But you say it's ambiguous. Is that — is that the kind of thing you decide on summary judgment, whether a man's statement is ambiguous or is that a jury question? No. I think that the court can — can decide that certainly as a matter of law. They can look at the evidence and say, this — this — You mean it's incredible as a matter of law? I think that it would be incredible as a matter of law to say that an issue is — That's what I'm — — brewing is an actual threat. — credibility on a summary judgment motion. We don't — we don't decide credibility on a summary judgment. But you just said it's incredible. So I take it that's a credibility issue. Well, I think that courts do characterize evidence as either strong or weak. On summary judgment? Tell me — tell me the last time we did that. Well, I — I think I've — I cited in my brief several employment cases where the court has noted that certain affidavits were ambiguous. In any event, you agree he used the wrong — the district judge used the wrong standard. Is that correct? Yes, Your Honor. Just with — just with respect to the objective prong. All right. He said it had to be obvious. That's right, Your Honor. That's incorrect. I believe so. I believe that whether a correction officer is conscious of an obvious risk has nothing to do with the first prong under Farmer. It informs the second prong under Farmer, which is whether or not there is a conscious disregard for the risk. But when a judge on summary judgment uses the wrong standard, why wouldn't the appropriate thing be to send it back to him and say, you're the district judge, use the right standard and make — and give us a decision? Well, Your Honor, because this court has the authority to review summary judgment de novo and decide the issue as a matter of law. All right. Now, as far as the issue of the protocols in place in this prison, your position is those protocols end the case. Is that right? Your Honor, I believe that those protocols coupled with the absence of imminency in this threat end this case. So if there had been imminency, then more should be done than just following the protocols. Is that what you're suggesting? No, no, no, no, Your Honor. I'm saying that I think it's impossible for there to be deliberate indifference under these protocols. That's what I thought you were saying. The fact of these protocols ends the case. Yes, but for this particular case, I think that he's got an additional problem, too. So let's take it a step at a time. First, as to whether the existence of the protocols are a complete defense. You're willing to assert that proposition? I am. So that if at this prison the corrections official learned that on day one, three members of this group have said, we're going to stab prisoner X tomorrow. And hearing that they still put prisoner X and members of the group in the same recreation yard at the same time. No deliberate indifference. No deliberate indifference because these measures. You really want to go that far? Well, Your Honor, I would say that these measures were designed to thwart the potential for violent behavior. Yes, but they're not foolproof, are they? Well, Your Honor, I would say that officers can reasonably rely on them. I think that, you know, in 1986, we saw the space shuttle blow up on TV. No matter what, they can reasonably rely. I think that. When they see the guy in the corner with his shiv and he's taking a stone and he's    And if it's not a violation of a protocol, here, we don't have to worry. Your Honor, I don't see how that could happen, because these inmates, the only time that these inmates are actually together is in the rec yard. This fellow was injured, wasn't he? I'm sorry, Your Honor? This fellow was injured, wasn't he? He was, Your Honor. So when you say you don't see how it could happen, this happened. It did, Your Honor. But to tell us that things can't happen isn't a very good argument in a case where it did happen. Your Honor, I'm saying that I don't think that there's anything that can rule out the possibility for the incredible to happen. Why not just making sure that when a threat from a gang member is received, that a guy is done, you don't put them in the same yard at the same hour? Your Honor, I think that you can't do that. They didn't do that in this case, at least for one reason, which is they didn't perceive that there was a threat to this man. They didn't see it. Well, and that's the question, but that, of course, raises the question whether they should have. But it's not that they can't prevent, at least lessen the risk. No, Your Honor. That's correct. This very risk, putting them in either separate yards at the same time or the same yard at different times. Well, Your Honor, but whether or not they should have appreciated the risk is a negligence issue. It's not a deliberate indifference issue. Well, sure, it's not just negligence. I grant you that. And the question then is, on these facts, were they indifferent? You're just saying they weren't, but that's a long way from saying the protocols take care of the case. Now we're on a very different issue. Yes, Your Honor. I think you're wise to move on, but you were first telling us the protocols took care of it. I think, well, I think that in this case, I think, I do think that the protocols, because they are designed to thwart the potential for violence stemming from gang affiliation, that they preclude a finding of deliberate indifference. Do they preclude the possibility that there could be an assault? No. But I don't see how you can inform. Whether they had a basis to fear assault on what they knew. Okay. So the three points that I would like to make, Your Honor, is that this case does not meet the farmer standard, and the judgment of the district court is promptly affirmed for three reasons. One is because this threat was uncertain and ambiguous and lacking in immanency. Well, let's pause on that. What made the threat ambiguous? Okay. Well, there's an issue brewing. What's that? Where is the specific, credible, and imminent threat of serious harm in the phrase there's an issue brewing? How about? The guy says he's done when the leader of a member of the leader, which is the fellow who said he's done. Mulligan was the leader, sir. The leader of a group of people known for violence in prisons says this fellow is done. That doesn't set off alarm bells somewhere. Well, Lieutenant Zwicky testified to him based on his 20 years of experience as a  So, dealing with that type of organization, gang affiliation, for a leader to say done meant that he was going to be terminated from his gang. And maybe a jury would agree with that, and maybe a jury would not. Maybe a jury would think he's just saying that to avoid liability, the way many defendants do in civil rights cases. Maybe, but it would, even that. Normally, we have juries to decide, is he to be believed when he says I discounted or, or, or is he, is he telling the truth? Maybe they're going to find he's telling the truth and they come in with a defendant's verdict. Well, Your Honor, it would seem to me that, that saying he's done still is lacking in the requirement of imminency. But he must say, and, and he's done and we're going to do him tomorrow. No, no, Your Honor. I think that maybe a phrase like, I'm going to bash his head in next time I see him. I see. And you don't think when a gang leader says he's done, that carries some ominous overtones? For violence? I think that it's It means we're going to demote him in the hierarchy of the group. We're going to take administrative action. Is that it? Well, could be. Don't, don't know. It's so Really? That's why the district court said this is uncertain and ambiguous. Well, let me ask you this. The, the, the district court weighed on the, the four months that, that elapsed between the July incident and the November assault, right? Yes, Your Honor. But as I look at the record that we have in August or September of, of 2010, which is only a couple of months before, Lewis is, is, is warned by Swickey and, and, and, and Butkus about a possible problem. Your Honor, it's That's not long at all. And also four months. What is four months when you're in that circumstance and it takes a while to figure out how you're going to, you know, evade the, the protocols? Well, Your Honor, four months, for four months, these inmates coexisted with one another and nothing happened. There's, there's not even a record of, of a foul word said amongst them. But then why in August or September, which is only two months before, does Lewis get these warnings? Well, and Everybody is coexisting so well. Well, that's, Your Honor, that's a really good question. It makes it sound like the testimony of Lewis was maybe incredible. However, looking at the deposition and what Lewis is saying, he's speaking of the July incident. He's speaking of, he's claiming, he's restating what Swickey allegedly told him about information he learned in July. So there's no new fresh threat. Oh, it's ongoing. No, it's, it's, it, it's one, one time in July and Swickey is taking him aside just before his transfer to a different unit to say, by the way, there's an issue brewing. Which to me, it seems a little incredible, but I, you know, we're not juries. We don't decide that. Can I ask you a different line about what might've been done? Is there more than one recreation yard in this prison? Not that these inmates were, were going to be recreating at. Well, that's the point. Is there more than one? Sure. There is more than one? Yes. So if they wanted to be, are they in segregation most of the day? They are. Isolation, I meant. I'm sorry. They're in isolation. Anytime they leave, they're handcuffed and escorted. The only time that they're together with other inmates is in the rec yard. Okay. And that's an hour a day? It's an hour, five, five days a week, one hour a day. And that's, that's in the record. It's joint appendix page 99 in the administrative directive. There was another yard in which this victim could have been spending his one hour a day. There is another opportunity. They could have put him on something called rec alone. So he could have been recreating all by himself. Where would that be? That they have a facility for that at Northern. Separate area. Yes. Oh, so that they could have had him, as you say, alone. All by himself. For one hour. Sure. But outdoors in a yard. Right. They didn't know there was a threat. Separated from any member of this group. Yes, Your Honor. They didn't know there was a threat. Thank you. Thank you. Your Honor, there's a point of clarification regarding whether that unit was full of pure bloods. The district court found that there was no evidence of the number of population of pure bloods at Northern or their housing locations. So that wasn't before the court, whether the unit was entirely full of pure bloods. That's a joint appendix 115. But to respond in rebuttal, it's important to note the standard for the summary judgment. Take all reasonable inferences in favor of the nonmoving party. Resolve all ambiguities in favor of the nonmoving party. In this case, what's done could be reasonably interpreted by a jury that that's a threat when it comes from the leader of a violent gang called the pure bloods. Do we know was the assailant handcuffed at the time? Won't get in further than he was, Your Honor, because the record shows that he slipped his cuff and then retrieved the secreted four-inch weapon to then stab Mr. Lewis. Sorry, you said he slipped his cuff? Yes, Your Honor. That's the way it's described in the incident report. He slipped his cuff somehow and then retrieved the weapon. Do you know, does the record reflect whether that's the type of thing that had happened in the past in this facility? Are there assaults like that that happen during rec time or otherwise? Your Honor, there's nothing in the record that would say the number of times this may have happened in the past to give an indication whether this is an ongoing problem or whether the procedures are not good enough. But the fact of the matter that in this case, the facts show that the defendant had this ongoing threat looming over his head. And then, and as Brother Counsel has stated, there was more than one rec yard and he could or Mr. Lewis could have done the recreation yard alone. That suggests that there could have been reasonable measures to abate the harm to ensure that a member from the pure bloods would not have attacked him in the recreation yard. That, in fact, is the problem with this case. A jury could find that the measures that the defendants did not take were not reasonable. Therefore, it was improper to grant summary judgment in this case. But we don't really know what the risk of harm is because there's nothing really that gives us any confidence about the protocols, the efficacy of the protocols. With respect to the efficacy, no, there's nothing. So maybe, you know, leave it to a jury to decide. Exactly, Your Honor. So whether these protocols are the best thing that can come up when they would protect the harms is not, is something for the jury to decide in this, under the facts of this case. We're not saying that the protocols are not sufficient in the general sense to protect inmates in a general sense. But on the facts of this case, where there is a disagreement with a violent gang leader and that violent gang leader issues a threat, maybe those procedures were not simply good enough. All they had to do was transfer him or move him to another rec yard so he can be by himself and therefore not be attacked. And that would be a matter for the jury to decide. So unless this Honor, this Court doesn't have any more questions, the evidence showed, when viewed in the light most favorable to the non-moving party, the evidence shows that Mr. Lewis met both prongs under Farmer. According to the district court's order, he should be vacated and remanded. Thank you. Thank you both for your arguments. The Court will reserve decision. The final case on the calendar, United States v. Dodd, is on submission. The clerk will adjourn court. Thank you.